Case number 22-1108 et al. Green Development, LLC Petitioner v. Federal Energy Regulatory Commission. Mr. Bustami for the petitioner, Mr. Esty for the respondent, Ms. Almeida for the intervener. Mr. Bustami, good morning. I don't know if we should call you the relief advocate or not. I know you're here on very short notice. Thank you very much. Good morning, Congress. My name is Omar Bustami for the petitioner of Green Development, LLC. I've respectfully requested two minutes of my time to be reserved for rebuttal. Your Honor, the filed rate doctrine prohibits utilities from charging any other rate than that which is on file with the Commission. It has been described as a nearly impenetrable shield, preventing discriminatory and extortionate pricing. Here, Your Honors, that filed rate is the ISA New England tariff, and that includes several key requirements that the Commission ignored when it approved a plan among two affiliated entities to generate over $18 million in new revenue through an improper direct assignment facility charge. Respectfully, this Court should vacate and remand FERC's orders for numerous independent reasons. First, as I've mentioned, there is the filed rate issue. Second, Your Honors, the Commission also failed to properly evaluate whether the filing parties met their statutory burden under FPA Section 206 to demonstrate that the charge is just and reasonable. And finally, Your Honors, the Commission failed to evaluate the totality of the circumstances with respect to each of the Commission's seven factors that the Commission is supposed to use to evaluate whether certain facilities are FERC jurisdictional transmission facilities or whether they are state jurisdictional distribution facilities. This isn't really a filed rate issue. There's no dispute that they have to allocate costs according to the tariff. The question is just what the tariff means, right? Your Honor, I would respectfully disagree with the contention that this is not a filed rate issue because the entire tariff is considered essentially to be, as a matter of law, a filed rate. Sure, sure, but there's just a question about what the word requesting means. Yes, Your Honor, but that word requesting, as Petitioner contends, is key here is determining whether the charge is appropriate. So if I may, Your Honor, I will address some of the key components of the definition that enable that charge to be assessed or not. So, principally, there are two essential filed rate issues that focus on two parts of the tariff. First, you have the definition of direct assignment facility. FERC erred by classifying these facilities as direct assignment facilities and, as such, permitting the charge to be assessed on the transmission customer, Narragansett. And that's the first error that FERC made by not following the definition of direct assignment facility. And the second key part. So, wait, on that, you're saying that because they misread requesting service, that, and how does that make the direct assignment facility determination invalid? It's basically, if they had done that, then they would have pinpointed a time when the need for the facility arose and they would have done a study that would have assessed who benefited from it and they didn't do any of that, in your view, or just give us a more practical on the ground understanding of what flows from your argument about the term requesting. Certainly, Your Honor. That's your description and Petitioner's view is correct. So, that provision establishes not only the basis for the charge, but establishes two things. Essentially, that the charges are going to one particular customer as opposed to being allocated across the board. And then, but second, more importantly, it establishes that there has to be a nexus between the transmission request and the upgraded issue. And the definition explains that the charges are to be assessed on the transmission customer, too. So, it's a little bit more than your ordinary definition that actually sets forth a lot of different provisions that have to be followed. It sets forth the basis of the charge. And so, that principle, in and of itself, in that definition, in Green Development's view, is an independent basis on which FERC erred. However, you also have the process. Just to stick on that for a moment. So, in arguing about the direct assignment facilities definition, are you disputing that the upgraded facilities would be for Narragansett's sole use or benefit? You're not disputing that. Well, Your Honor, Green Development doesn't believe that there's any evidence in the record to show that these are needed for a transmission purpose for Narragansett. However, even assuming arguendo, that they are needed for Narragansett, that doesn't permit the agency to act contrary to the filed rate. It still has to evaluate the filing party's burden, and it has to evaluate whether the definition is correctly adhered to in order to permit the charge. So, what we believe you have here, and the respondents have sort of teed it up as sort of a cost causation argument, but really, whenever the cost causation principle, which is really this idea that if someone benefits from something, they have to pay for it. So, here, that beneficiary, theoretically, is Narragansett, the transmission customer, not Green Development, that essentially this has to be allowed because Narragansett somehow benefits or needs this for transmission. But whenever that principle comes to attention with the filed rate, the filed rate prevails. The filed rate doctrine doesn't allow the agency to waive the operative provisions of the tariff to allow charges to be assessed after the fact. If the filing parties wanted to assess charges in that way, they would have to file something with the commission that allows that to happen first. So, it really is a notice principle to put the rate payers on notice of what's permitted to be passed through and flowed through, and sort of transitioning to the kind of second key parts of the tariff, which is Schedule 21 local service, we think that provides more confirmation of this understanding because you basically have four key parts of that rate schedule. So, the first one is the preamble that the filing parties have to demonstrate were met. So, first, you have the preamble of that provision, which basically requires that all transmission customers taking service are subject to those terms and conditions. Next, you turn to, and if you need a specific reference, I can certainly provide it to you, but I believe it's Section 2 of Schedule 21, LS 2nd 2, Part 4. So, what is essentially laid out there is a very clear process by which whenever the transmission owner wants to, and customer in this case, wants to amend what's referred to as a local service agreement, they have to file a request for transmission service. So, that's key here because that's what happened in December of 2021. The filing parties came in and they amended their local service agreement. So, you have that provision in Schedule 21 that requires a transmission service request as a condition precedent for the amendment to the local service agreement. And so then what happens is the ball shifts to ISO New England in order to evaluate whether or not a system impact study is needed. Now, it's true that ISO New England gets to decide whether a system impact study is needed, but the proverbial ball that puts that in ISO New England's court is the transmission service request. So, that didn't happen here. And we see no evidence in the record that there was ever a transmission service request in connection with these particular upgrades. And so, because of that, the ISO didn't really get to, or actually did not get to evaluate at all whether or not these upgrades are needed to accommodate Narragansett's request for additional service. And I would like to direct your honors to what we think is important as part of evaluating the text purpose structure and history of the tariff. Because the definition of direct assignment facilities really derives from a rulemaking in the 90s called Order 888. It's been described as a bedrock of electric utility regulation by this court. So, that order actually goes into an explanation about why the commission allows specific transmission upgrades to be assessed and charged to one particular transmission customer as opposed to being broadly allocated. And what the commission says is that it really has to do with that customer's need for additional transmission service over what the transmission customer is already receiving. So, in other words, transmission customer is getting general service, but then it wants a little bit more. So, it makes sense that if by that request causes the need for an extra upgrade, that transmission customer has to pay for that extra upgrade. The commission is very clear about this. So, in principle and according to the filed rate, redevelopment prevails on both on both aspects. But in any event, the filed rate, Dr. Musgravelle, you think it's genuinely disputed that these upgrades were at the request of Narragansett for Narragansett's benefit as opposed to, I don't know, Boston Gas or New Hampshire Gas or whoever? Yes, your honor. We do think that is genuinely disputed. And your honor, I see that I'm approaching the end of my time if I may proceed to answer your question. A little bit of what might be helpful to color this situation is to understand that green development uses, to the extent these facilities are needed at all or any part of them are needed, they would be used in order to deliver power to Narragansett's customers on the distribution grid. So, the question here isn't really just, does Narragansett need the upgrades? The question is, does Narragansett need them for a transmission purpose? And Narragansett does not need these for a transmission purpose. And there's nothing in the record to indicate that they do need them for a transmission purpose. Instead, what's happening is that green development is already paying for these upgrades under the state distribution interconnection agreement. And now, because of these duplicative charges, green development is being essentially assessed a duplicative charge. And that's exactly what the filed rate doctrine is intended to protect against, discriminant extortion and pricing. I have a question about sort of just really stepping back and in a very kind of real world practical lay person's way. Can you describe how green development's project relates to the Iron Mine Hill substation? I mean, it seems to me that FERC and New England Power are relying heavily on the notion that the substation is connected to 115 kilovolt line. And it's sort of that's transmission. End of story. And, you know, there's a question whether that's the right analysis given the seven factor test. But be that as it may, what is and your narrative is kind of like, no, we only ever were getting involved with Narragansett for distribution. We're generating power that's supposed to be used within the distribution system. And it's like this, you know, sort of weird formality that we end up getting sucked into a into FERC jurisdictional land. And I guess I'd like to understand more the layout and how you have an argument that green development is not actually in transmission land, if you will. Your Honor, that's precisely correct. Green development is not in transmission land. So and not to get into too much of the technical aspect, because we understand that's not what the court's job is to go in and evaluate technical questions. It's really for the agency to understand that. But what's practically going on here is green development is essentially building projects on the distribution system. So you'll hear this term distributed generation. So what green development, you know, basically understands that to mean distributed generation means generation that's essentially produced and used on the distribution grid. So it's not in transmission land. So what happens is that green development goes to Narragansett and, you know, wants the actual generation projects, not the wires and the equipment that are issued here. They want the generation projects to be studied. And Narragansett comes back and basically tells them, well, this is what you need to do to upgrade, you know, the wires on the system in order to facilitate your distribution. And in this case what Narragansett actually did is they gave green development two options. And green development didn't know that either option was going to entail a transmission charge. So from the get go, green development didn't know that. At the 11th hour, they find out that there's transmission charges, but it's really too late. So they have to – sorry. I'm listening. Go ahead. Yeah. So how does green development end up in transmission land? I mean, that's really a question. So was there an option that wasn't taken that would have clearly been slower and maybe more expensive, but would have avoided Narragansett pulling green development into a, you know, transmission system? So green development's intentions, yes. Yes, and that is correct. However, even if that – green development needs an opportunity to properly understand whether that's true or not. So if there really was another option where transmission wasn't needed, then green development, you know, theoretically would have picked that option if the deal was going to lead to all these duplicative charges. Under the circumstance in the case, is it sort of as a matter of understanding the scenario to which one applies, the seven factors, is it the case that under – you know, given the substation that was built, that effectively green development's power is being put out into, you know, the regional transmission system? And, you know, it's anybody's guess whether some of it is being used for distribution to Narragansett's distribution system, or is it sort of, you know, nominally going there for a moment and then being stepped down and brought back? No, Your Honor. The power is not being used on the transmission system. Under the seven-factor analysis, it's not a bright-line test. I know that, and I'm trying to stay – because I've read and thought through the factors, but what I'm trying to understand is, like, I don't have a map of how the – what is it – H-17 relates to the distribution system. Do we have that in the record? Your Honor, yes, we do have that in the record, and there is actually a sketch in the record, and if you permit me, I can refer you to that. Okay. I'd like to answer your question, however – Is that the one on JA-67? Because I have a question about that. Great. That shows the H-17, but it doesn't really show the – what is it called? The tie? Your Honor, that is the schematic that I was referring to, yes. Right. So below the Iron Mine Hill, am I correct, is the feeder that is not part of the jurisdiction, and below that is where Green Development has the solar project? Correct. All right. My question is, where is Narragansett in all of this – in this schematic? Because the West Farnham No. 17, the Farnham No. 105, isn't that all New England power? So, Your Honor, if you're looking at this schematic, and you see this West Farnham station, and you look to the right, that is Narragansett's distribution system in Green Development's contention. Okay. That's Narragansett. That's not New England power. That's being utilized in order to move power on the distribution grid to serve Narragansett's retail load. And the only instance in which power could ever reach the transmission grid in this case is if there's a power overload. So, Your Honor, Judge Miller, you mentioned the seven-factor test, so not to walk through that, but we know that one of the tests is to look at the proximity to retail load, and that's evaluated through the purpose and the customers served. So, what Green Development – excuse me, what the commission found is that because the facilities weren't connected to retail load directly, that they failed that test. These, therefore, are transmission facilities, but that's not what the test asks for. And FERC's order actually concedes the point that the facilities are used to serve Narragansett's retail customers, which are the customers on Narragansett's distribution system. So, you said to the right – like, so where is the tie to the retail load? Where do we start to step down from 115 kilovolts to the distribution level voltage? It's not depicted here. I'm just wondering where that happens. I mean, I'm sort of thinking about this. This is, you know, I'm sure pretty crude, but, you know, where the highway comes in and it ends and then you spill out onto Mass Ave, right, under the tax cord. You know, if we have transmission and distribution, you know, the local streets are akin to distribution. The highways are akin to transmission. But where you have, you know, a highway that is coming in and interfacing with the local streets, like, is that analogous to the situation here where just because the, you know, the slowdown light was put on the last bit of the highway versus, you know, further on at the intersection? I'm just trying to visualize because I think it's actually important for application of the jurisdictional tax. And I think in that analogy – and apologies if it is a crude analogy on my end as well – but I think the best way to look at it from that standpoint is that you really have a distribution. The distribution is your surface road. That's not the highway. And you have the primary purpose of this road is, you know, a surface road, not a highway. But let's say that that surface road gets congested. Then you might have cops directing some of the cars to get back on the freeway to make way for other cars or to use the freeway as a bypass, essentially. So the primary purpose is not transmission. It's really just sort of a backup purpose. And the electrons will rarely ever flow out. But where is in? You said they rarely flow out, meaning out of the distribution system. Out of the distribution system. Where is the distribution system on this graphic? That's what I'm not understanding because, I mean, FERC is basically saying, H-17, that's a transmission line. This facility, Iron Mine Hill, that's right on a transmission line, right? And, I mean, really their analysis of factors seems to collapse into, hey, 115. And I'm trying to understand your comeback to that. It's like, yeah, maybe 115, but this is in a distribution setting. And I don't see the distribution setting or understand really where it is. So in large portion, I think the reason that is from this particular schematic is because the distribution system is somewhat invisible here in whole because this is really just focusing on the point of interconnection. Exactly. But in order to apply the seven factors, don't we need to know at least how the point of interconnection relates to the distribution system? Yes, Your Honor, and we think that it doesn't solely rest on necessarily this schematic. There's more information in the record. But I'm asking you to sort of, using what you know about the other information in the record, sort of sketch for us where, what would be shown to better explain that to us? Sure, Your Honors. So what would be shown here is essentially, you would have the generation facilities shown, depicted, and then you would essentially. Where are they in relation to Iron Hill Mine? Do they feed directly into Iron Hill Mine? Are they above or below Iron Hill Mine? Do we know? I mean, when we're talking about proximity and we're talking about direction of flow and all that. So the generation facilities are below Iron Hill Mine? Below meaning? Below meaning to the right of over here on the schematic. As is the residential users or the retail users? Exactly. All right. Your Honor, if you permit me to be able to respond to that on rebuttal, I may as well. Are you finished? Okay. All right. We'll give you a couple of minutes and rebuttal. Thank you, Your Honor. Mr. Estes? Good morning. Good morning, Your Honors. I'm Matt Estes here on behalf of the Federal Energy Regulatory Commission. I'd like to go to the questions Judge Pillard was asking because I'm afraid Mr. Vestami was mistaken. What's going on here is these four solar projects are relatively large. And so if they were delivered to the distribution system at all, there would be a thermal problem causing those lines to melt. So what ended up being proposed, the option that Green Development accepted, was to construct first a one-and-a-half-mile distribution feeder that was sufficient voltage that it could take this power. And then that delivers that power to the new Iron Hill substation where it flows onto the transmission system and then is taken off the other points of delivery on the Narragansett system where it's... To the right. Yes. And so I was trying to look for this where I could explain how this is the case during this discussion. I couldn't find it. I can write a letter. But at one point in the description of the new facilities, it says that there's no load connected to the new circuit they're constructing. What that means is that none of the power is taken off of the distribution feeder to serve distribution load in that area. It all goes to the Iron Hill substation where it then goes onto the transmission system and is taken off at other points to serve retail load. But there is no... There's nothing in the record suggesting that Green Development's power would not be ordinarily fully used within this distribution system. Well, no, there is because it's not even connected to the neighboring distribution system. I understand it's not directly connected. But were we to think... I mean, let me back up. It sounds like, as I was saying to opposing counsel, that in FERC's analysis of whether this is a FERC jurisdictional project, basically the thing that matters is whether this goes on to H-17 or not. And that's really it. Well, that's the most important point. But I think if you go through the seven factors, you get to the same point. We can talk about that. But there isn't a regular scenario in which the power is flowing to the region or elsewhere. Just this power that Green Development... I'm sorry. You mean the region? Do you mean the area where the solar facilities are located? No, out to the other towns and cities as opposed to this distribution. No, the whole point of it is for the power to go through the transmission lines, the local lines, and then back onto Narragansett's system. Distribution system? Yes, that's correct. But not at that location at other locations. So you say that if it weren't Narragansett paying as a solar facility, then the cost would be unfairly shared among either Narragansett's retail customers in the event that we were to hold this not FERC jurisdictional or other transmission customers that don't benefit from these upgrades. But I'm a little unclear because I thought that Green Development was already responsible under its, I guess, its state level tariff for paying for operations and maintenance. Well, so I'm trying to understand what the separate costs even stand for and whether there's anything to Green Development's argument that this is double charging. Well, the commission didn't address that because the commission's statutory duty is to have just and reasonable transmission rates. So, in its view, it would not be just and reasonable to assign this cost to any other transmission customers. But if this cost were already being paid, I mean, it's a little bit like, you know, your state and federal taxes. If you're already paying something in your state tax, you get a credit at the federal level. But, you know, if Green Development is right that these exact upkeep or maintenance costs are being paid under the state tariff, then is there any, anybody else that would have to pay them? Were they to prevail either under the tariff or on their jurisdictional argument? My understanding that this isn't something the commission found, and my understanding is there are some, if this is deemed not to be a direct assignment facility, that there are some operations and maintenance costs that wouldn't flow to Green Development under the interconnection agreement that would be paid by other transmission customers. Now, I would just point out on the whole duplicative charge claim that Green Development filed a case before the Rhode Island Commission making that claim, it's ongoing. And I would think that if, in fact, duplicative charges are being, or they're being subjected to duplicative charges that the Rhode Island Commission would address that. But that's not the commission's concern. The commission would be arbitrary for them to assign some costs to other customers because they were worried about duplicative charges under the state agreement. So the commission didn't consider the distribution feeder in its analysis, and it said that was because it wasn't part of the project. But that seems to me, potentially anyway, a too narrow understanding of the seven factors. The seven factors look at context and often include things that aren't actually part of the project. So it would seem like it's relevant whether the distribution feeder is, you know, confirms the proximity of the ultimate customers and the like. Am I missing something about that analysis? I think what you're missing is that the commission didn't say that it wasn't part of the project. They were just determining whether the facilities subject to the direct assignment charge were transmission facilities. So, whether or not the distribution feeder, which undisputably is a distribution facility, if the seven factor test suggests that the distribution feeder is a distribution facility, the commission would say, yes, that's right. The question is, is the Iron Heel substation a transmission facility, and therefore the cost could be directly assigned to Narragansett, or is it a distribution facility, in which case it couldn't because that wouldn't be an appropriate transmission charge. So, the fact that the distribution feeder is approximate to retail facilities means it's a distribution facility, yes, but the Iron Heel substation is not, according to the commission, and therefore that weighs in favor of making it a transmission facility. I guess what I'm saying is that under this, applying the seven factor test to the Iron Heel substation requires looking at the purpose and the customers that it serves, which would include looking at issues like whether the power is reconciled or transported to another market, or whether it's consumed in a comparatively restricted geographical area, and I took Green Development's argument about it being consumed in a relatively constricted geographical area to rely on pointing to the feeder and pointing to the whole function of this as a project in the first place. Well, the whole function of the project is to bring the power out into the transmission system and transmit it to other parts of the Narragansett system, so the commission found that that purpose was a transmission purpose. Again, then just pointing to the voltage of the H-17 line. Not just to the voltage, but to the fact that all the power goes to the Iron Heel station and onto the transmission system. But you're characterizing it as a transmission, as going onto the transmission system, and Green Development says, yeah, temporarily, it just is being stepped down, and then it's flowing right back into a distribution feeder. Somewhere else, yes, on the Narragansett system. Now, maybe you could, I think that is the type of judgment that's well within the commission's discretion to decide whether that's proximate to the facilities or that's far enough away, and here, that's what the commission determined. Okay. Mr. Estes, I didn't want to cut into your time, but I wanted to ask you just briefly about FERC's implementation of our Allegheny defense project and bank decision a couple of years ago. And your attachment B is, and of course, as you know, that's where we threw out the tolling orders. Yes. Okay. Your attachment B, which is the order of April 18, 2022, denying by operation of law, I guess, the rehearing, but at the same time, the next paragraph says, we reserve, in effect, we reserve the right to revisit this. And you did, FERC did revisit it within, on June, I think it was 16th, within the 60 days that you have before the petitioner-like green development could come before the court. Right. And my question is, and so I want to ask you if this is the standard operating procedure, because it seems to me that FERC would take longer than the 60 days, but just would run the risk that after the 60 days, a petitioner would come into court and you would lose jurisdiction. Is that your understanding that you don't have to? Yes, Your Honor. I think the Allegheny defense decision suggested that the commission could issue another, an order addressing the merits at any time until the records file with the court, at which point the commission loses its jurisdiction. And because, and this court suggested that because the commission said it's frequently difficult to rule on cases in the 30 days it has to issue a ruling. And that's certainly the case. So very frequently the commission does issue one of these notices that says it intends to rule. Sometimes it issues a notice saying it's denied by operation in law and we don't intend to rule. You can go ahead, but typically we say that we do intend to rule. And sometimes we even ask this court, or whichever court it is, to obey the proceedings so that we have more time before we have to file the record. So that is typically what we do. And do you get time from the courts? Usually, not always. And sometimes, you know, the point in Allegheny defense was that the court gets to decide how long we get. With the Tony orders, the commission got to decide how long it had, but under the new regime, the courts get to, get to supervise how much time we take. And typically, if we're not asking for a whole lot of extra time, the court will grant it, but not always. My question still is, if you waited until after the 60 days is first position. If the petitioner doesn't go into court and waits on you thinking, well, we might get the relief here. Still, it's just going to take more time. Have you done that or do you stick strictly to that 60 days? No, we don't stick strictly to the 60 days. And I think there are cases that came out after Allegheny defense that said that if the party waits until after we do rule, even if it's more than 60 days after the notice is denied by operation of law, the petition is still timely. You don't need to respond to this. I don't still don't know what we accomplished by that opinion. But anyway, well, thank you. All right, I have a couple of questions if I might about the, the tariff points in schedule 21, the portion that talks about transmission customers wishing to revise local service agreement termination data or make upgrades. Is that is that understanding? The reason that schedule 21 would apply would because this is an upgrade. That's our, that is our reason why we thought that a new request was not required. Is that your question? Yeah, I just wanted to know as a, just as an expert matter, this is would be an upgrade and, and therefore, it's not required to execute a new local service agreement. Right, because there was, it was an upgrade to address changes in the operations of Narragansett, not a new request for service. So, the point, I think the schedule 21 says that the new request for service is required to facilitate revision of the agreement. But the revision has nothing to do with providing new service and a request doesn't facilitate vision. And that goes back to the, to my other question, which is about the language requesting service. And I mean, one of the rules that we use in interpreting legal text is to is to give a parallel definition to the same term used in the same provision. And we have requesting a transmission customer requesting service or a generator owner requesting an interconnection. And the first use of requesting to mean it could be in an ongoing way and receiving service. But it's really hard to read the second requesting a generator owner requesting an interconnection to also countenance something that's already happened or happening. And so, that would seem to me to really support Green Development's view, which is that there has to be a discrete request. And that would at least trigger the possibility of particular, of, you know, accompanying studies. And it helps to identify the time, you know, the sequence of whose demands are making, are overloading the system. Why is that not the right way to read requesting or, in fact, the only way? Well, I think there are differences between the transmission customer and the generator requesting interconnection. Because when you request interconnection, by definition, you're making a request to increase, to make a change to the transmission system to increase. Exactly. And yet the same word is used, requesting service, indicating the same idea of an incremental new moment rather than. Well, I think the difference is it's not possible for a generator interconnection to have the same fact that we have here, where it's not. In this case, it wasn't a request for new service. It was just the change in the operations of the customer that caused the need for these facilities. And I think it's important to note that the tariff doesn't refer to a new request for service or a contemporaneous request for service. It just says a transmission customer requesting service. And the fact is that Narragansett has been taking service continuously since it made its request. And, in fact, because it's customers, it serves retail customers whose loads are constantly changing as they turn the lights on or off or the air conditioning on and off. Narragansett is continuously revising the amount of service it wants. It's constantly revising up and down the service that it's requesting. So I think it's reasonable in that circumstance to treat them as a requesting customer. But is it constructing facilities? I mean, that's what this provision is. Is it constructing facilities or portions of facilities in response to, as you say, the up and downs of its service? It seems like one way to read this, and arguably the most reasonable way to read it, is that when there's that kind of increment that requires the construction of facilities or portions of facilities, that there should be. And even though it's incremental, I understand the facts that you've just described, but there should be a distinct service request. Because isn't this the provision that triggers or may trigger various studies about the system impact and the like? Well, Your Honor, I don't think that's correct because, I'm sorry, I lost between a thought. I was just saying that the interrelationship between a request for service and whether there's an application required and potentially a system impact study required. Some, you know, moment where that comes to FERC's attention and this is analyzed. I think it's important to realize or to note that the tariff doesn't establish a request for service as a separate requirement to be a direct assignment facility. It's really identifying what customers could be subject to having to pay direct assignment costs. So in that context, we're talking about the question is, is Narragansett a transmission customer requesting service? And I think it's reasonable to say they are because they requested service and they consistently take service. They've never stopped. It's not like a situation where you made a request, stopped, and now you need to make another request. It's ongoing. So because it modifies transmission customer and doesn't establish a independent requirement, I think it's reasonable to interpret that as applying to Narragansett in this circumstance. All right. Thank you. Thank you, Your Honor. Ms. Almeida? Good morning, Your Honors. May it please the Court. Marianne Almeida on behalf of Intervener, New England Power Company. I'm happy to focus my time anywhere where the Court has particular questions. Otherwise, I'd like to start with the jurisdictional argument. And I'd like to first frame the question because it's different than has been discussed throughout this argument so far. It is atypical for a generation of this magnitude to be connected in the way that this generation was. It is far more common for it to be interconnected directly as a generation facility to the grid itself, rather than through a substation as is set up here. The reason this is important is because only a portion of the facility that is a direct assignment facility under the terms of the tariff is what is actually paid for under the FERC jurisdictional determination here. And that is the portion of the facility that interconnects the H-17 line into the Iron Mine Hill Road substation, not the portion of the substation that includes the distribution feeder, the 34.5 kilovolt line. It's only the portion that connects to that transmission line itself. So is that your answer to double charging, is that there are two different portions of the facility and one of it is considered to be federal jurisdictional and its maintenance and operation is charged under the federal tariff and some other portion of it is considered to be state jurisdictional and charged under the state tariff? Yes, you're right. Only the portion that is under the federal jurisdictional tariff, the H-17 transmission interconnection, is the portion that is before the court and that was before FERC originally. The reason that that's important is because that's what the jurisdictional determination must be made based on, not the 34.5 kilovolt feeder, not the portion of the facility that is within the distribution area. I haven't really taken the argument to be dividing the facility into parts. And when we look at the facility under the seven-factor test, there's a bunch of factors that just seems like FERC hasn't analyzed. I mean, we don't, the proximity to retail customers, the configuration of the facilities, maybe you can speak to some of the questions that I had earlier about, you know, what is the proximity to retail customers? I thought they were right down the road. Certainly. So let me first answer the preamble to your question there about the portions of the facilities. Now the definition of direct assignment facility explicitly recognizes that portions of facilities can be directed. I understand that, but I just hadn't read your brief or FERC's brief or its order under review as bifurcating this facility and the charges associated. That's because it's only a portion that is transmission related that is at issue here. And so if I can get to why that portion is transmission related rather than distribution related. I think the factors, while they are a poor fit due to the nature of this project that is being connected, still in their functional and flexible way demonstrate that it is transmission. The most important factor, and to get your honors questions earlier about the 115 kilovolt line, it's not just the magnitude of the voltage there, but it is that line is an existing transmission. ISO New England has treated that line as transmission throughout. And that transmission line needed to be redirected and reconfigured through the new substation to accommodate. To make that portion of an existing transmission facility, consider distribution would be completely inconsistent with how that line has been treated throughout its existence. To the first factor of the proximity of retail customers. Before you get to the factors, can you just give me in plain English, if possible, a summary of these two components. There's something called the distribution feeder, which has been held to be distribution and it's not before us. And then there's this other thing we're talking. So just tell me what those are and how they relate. Certainly, your honor, and there's there's two configuration diagrams in the J that I'd like to direct you to. And the first is J67, which was discussed earlier. Right. So in the proposed new configuration in very small at the bottom, you can see a little squiggly line. It says thirty three slash fifty five. Can you get a little closer to the microphone? Just let me try that. Is that better? Can you start again? My apologies. I'm on a J67. The bottom configuration, the proposed new configuration in the iron mine hill substation, that substation, the center of the diagram there, there's a little squiggly line noted with thirty three slash fifty five. That is shorthand for the transformer that exists between the distribution feeder at thirty four point five kilovolt and the hundred and fifteen kilovolt line. So that's where the boundary is between the distribution facilities and the portion of this substation that relates to transmission. The place where it's easier to see this is that J.A. four ninety four. This is an expanded image of the configuration that is part of the interconnection study that was performed in considering whether the upgrades to the transmission system were necessary here. You can see the same transformer about a third of the way down the page. And it's listed as with the broader terms and explanation that it is the hundred and fifteen to thirty four point five transformer. So that's the distinction between the above that. Sorry. Sorry. My eyes aren't that good. Where are you? It's difficult to see. Is that labeled number one you're talking about? No. Yes. It is. It is labeled number one. That's the transformer. To the right of what looks like two squiggly lines. Correct. The squiggly lines is the transformer as represented in this configuration. Beneath that is the thirty four point five kilovolt area of the substation. Above that is the hundred and fifteen kilovolt area of the substation. You can see the area above the lines of H. seventeen going to West Barnum in one direction and Riverside in the other direction. Those are other substations on the H. seventeen line. And again, that H. seventeen line is the existing transmission line that ISO New England recognizes as a transmission facility. And am I correct that the power is largely not exclusively in practice? It can flow either of it, but flowing left to right in terms of green development is not taking power off. Except potentially to run its facility and it's putting power on and sending it to the right. Your description of green development's role is correct, but in this configuration, green development is at the bottom of the page. But the energy is up to the left and Riverside is off. Right. That's great. But the hundred and fifteen kilovolt line can go either direction. Can go. Can go. Green development's power, though, there's no evidence that does anything other than go one direction. Which is on this page is up to the transmission. And then out Riverside. Out in either direction on the transmission line. Can go, but does go? My understanding is that it does go either direction because that line goes both directions. There is nothing, though, that it would be unexpected for power to go down the page to green development. Which is the way that the factor plays here is that that the. The power flow goes from green development. Ruby thirty four point five kilovolt line in the distribution node. On to the transmission line, and then to other distribution loads after flowing onto the transmission line. And in terms of proximity to retail customers. It was just said that it's transported across the system. So, we're not really going to look at the, who actually is ultimately using this. So, the proximity is measured in terms of purpose. And the purpose is that it goes not to another customer within this distribution node, but to customers on other distribution loads, like Riverside or West or farther away. The Narragansett system covers basically all is a node the same as a, as a. Substation I was not there about that as a technical matter. And that is my understanding that the distribution notice as we use the term here refers to the substation. I believe you could also refer to a particular area of generation to be a node, but as we have used it in our brief, the. Distribution level is what we consider to be. That means that the proximity of the customers is further away, even if it is not. As far away as redevelopment would have it be the fact that it goes over the transmission system to get to those other customers shows that the purpose is within the transmission grid. We've also talked about factor 3 that the distribution goes out of redevelopment facilities onto the transmission grid, not the other direction. And, of course, factor 7, which gets back to the size of the voltage line that it exists on a transmission line. But the director of the direction of power flows, typically, the perk has analyzed not just whether power. And flow in 2 directions, but how much power actually flows out relative to how much flows in. So, it would seem that their direction power flows very much favors. Green development's position, I disagree your honor, because the purpose of this connection is for the power to flow out. That right and that's that's 1 direction, not not for it to flow back in. So, it's not the green development is taking anything off the transmission system. It's really here to put it on and then you get to the factors, 4 and 5, which the mission kind of blew off. But I think are central to green development's position, which is that. The power, you know, whether the power is distributed to a local distribution system and technically, of course, it goes onto the. System, but it, it is, it's not transported off to another market. It's consumed and comparatively restricted areas. Not your question gets again to the distribution theater, which is not part of the direct assignment facility. It's not part of the facility, but it's part of the context. And I understand this. This analysis to look at the context, not just the facility itself. It's looking at. Retail customers, those are not part of the facility. Right. Certainly, and where things are consumed, that's not part of the facilities looking at the context. Right and but it's the context of the facility and the context of the relevant portion of the facility here is all transmission. It's not what happens beneath the transformer that we've looked at it for 9 before. I see my last, but I'd like to just briefly address the requesting service question. Substantively redevelopment would reduce the phrase customer requesting service, the requirement that does not exist in the definition. And that that phrase contains no such requirement by terms that a request be contemporaneous. This compares with what the definition says about specifying the direct assignment facilities in a separate agreement. Or elsewhere, and the parts of the phrase at most is temporally ambiguous to which this court would defer to folks determination. If there are no other questions, I think. Mr. Bruce, tell me, why don't you take 2 minutes. Thank you very much. So, I 1st, I wanted to address the prior question. I didn't want to address the prior question regarding where the transmission distribution or relation to each other and what redevelopment contention is. So, I think that for and intervenors explanations actually highlighted many of the issues. What's what's happening here is that it's true that the right is a distribution system. But the, the left side of the schematic, so referring to the 115 kilovolt line is also a distribution line. So, so when is saying that this power is being transmitted on the transmission system, because it's on a transmission line is begging the question somewhat circular because the question is that line, a transmission line or not. And the problem, I think, is highlighted by for counselor is that is focusing on an assumption that the line is transmission to classify this line as transmission. But really, the focus is on the destination of the power. And I think it's clear from the record and also the statements of council that the purpose of the destination of the power is retail. So, that's that's that's the answer to what is on the left of the line, but isn't the end purpose of all generated power ultimately retail. And the question is about how it's carried there. The ultimate purpose is going to be retail, but what separates is the retail function is going to be whether or not you're in, you're doing a wholesale transaction or not. So, you have other powers transmitted in general on the transmission grid, ultimately gets to retail, but it first goes to someone else. But isn't that just as circular as what you've just accused of doing saying, you know, we only intended we didn't intend this to go to wholesale, even though it's going to Narragansett and Narragansett is somewhat treating it wholesale by putting it on this. Interconnector because what I'm what I'm focusing on here is who's going to who's going to be the 1st person in line to purchase that power. So, the 1st person in line to purchase the power here is going to be the distribution customer in the wholesale context. The 1st person to purchase the line is going to be the utility like the line. The power power. Excuse me. The purchase of power on the is going to be the utility like Narragansett. Let me just back up on the on the direct assignment facilities definition and the, and the requesting power. If you were right about that, what happens? After we met with Narragansett, submit an application for service and do any missing studies. And then and then go ahead and charge the direct assignment facilities charger. Is it too late for that to happen? Is that why that's an advantageous position for you? No, your honor. It's not too late for that to happen. We hope that on on that the orders will be vacated and remanded and then on remand, we will see for require a transmission application. So that green development can and another customers can also have a chance to evaluate why these upgrades are needed. So, I think if I may, your honor address another point from the interviewer council. And I know that there was some discussion about this idea that, oh, could you split up the facility and charge some for transmission some for distribution? We just want to point out that all of these facilities are being included, including the theoretical transmission size is being included over here. So, that's why there's a duplicative issue because we're already so even in theoretically speaking, you could split it up. It doesn't solve the duplication issue. So, because they're not splitting up because they're not splitting up. Exactly. And what is the Rhode Island proceeding that council pointed to the correct place for you to raise that? No, your honor. So, in terms of the splitting up of the, of the, of the facilities, avoiding duplicative costs. That would not be the correct place to address whether there are transmission charges that are being assessed that are duplicative with the state jurisdictional charges because the Rhode Island commission is not going to look. At whether or not these are actually legitimate transmission charges, they're just going to defer to whatever for things. So, that's part of the issue over here. The charges are essentially just being passed through and power affiliates at the time. So, the pastor is just automatic. That's correct. That's precisely how we wound up in this problem. Everybody's pointing fingers to the other person. Isn't it really how you wind up in this problem that you entered into an agreement with with a very big term that was as not yet pinned down and started building the facility without. No, no, your honor is because when you're talking when you're talking green, I presume that you're talking about distribution interconnection service agreement. And so when you're looking at the various provisions of that, but what you're really looking for is that these are essentially placeholder holders for charges to be passed through and assess on the customer. So, theoretically, the interconnection agreement permits green development to be assessed. These transmission charges pass through, but if there's 0 charges, then there's no password. All right, thank you. May I conclude in requesting the court on remand on arbitrary. Thank you. Thank you.
judges: Henderson, Pillard, Katsas